## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JENNIFER MCKNIGHT and SCOTT MCKNIGHT, on behalf of Themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-10-30-R |
| LINN OPERATING, INC., a Delaware Corporation, LINN ENERGY, LLC, a Delaware Limited Liability Company, DOMINION EXPLORATION MIDCONTINENT, INC., an Oklahoma corporation, and DOMINION OKLAHOMA TEXAS EXPLORATION & PRODUCTION, INC., a Delaware Corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

Plaintiffs Jennifer McKnight and Scott McKnight, on behalf of themselves and all other royalty owners similarly situated, have filed a motion for class certification in this action against Defendants Linn Operating, Inc., Linn Energy, LLC, Dominion Exploration Management, Inc. and Dominion Oklahoma Texas Exploration & Production, Inc. Doc. No. 119. Defendants have filed a response to the motion [Doc. No. 140] and Plaintiffs have filed their reply brief [Doc. No. 149]. On February 5 and 8, 2016, the Court held an evidentiary hearing on the motion for class certification.

Pursuant to the Court's Order, the parties have filed proposed findings of fact and conclusions of law.

The individual Plaintiffs, the McKnights, own royalty interests in the Millington 4-11 well in Grady County, Oklahoma. Linn Operating, Inc., the wholly owned subsidiary of Linn Energy, currently operates Plaintiffs' well and the "class wells," *i.e.,* the wells in which proposed class action members own royalty interests. Dominion Exploration Management, Inc. and Dominion Oklahoma Texas Exploration & Production, Inc. previously owned or operated some of the class wells. Linn Operating, Inc. currently operates 1,693 wells in the state of Oklahoma which fall within the proposed class definition. Of those 1,693 wells, 1171 were acquired from the Dominion entities. The individual Plaintiffs' royalty interests are derived from a lease with the following royalty language:

> The lessee shall monthly pay lessor as royalty on gas marketed, one-eighth (1/8) of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then one-eighth (1/8) of its market value at the well, which proceeds or market value shall be deemed to be the price paid by the purchaser in either case under any gas sale contract entered by lessee and approved by the Federal Power Commission or other regulatory agency having jurisdiction, if such approval is necessary, but in no event shall lessee be required to pay more than one-eighth (1/8) of the actual amount received by the lessee and lessor hereby authorizes lessee to enter any such contract and obtain any such regulatory agency approval thereof covering the full interest in gas produced hereunder without joinder therein by lessor
> . . . .

Leases with alternative language are involved in this class action, but according to Plaintiffs, any variation in lease language does not affect the issue of class certification because each class lease contains the implied duty to market. However, the royalty

owners having some leases which negate the implied duty to market are included in the class to satisfy the "pot theory" explained in *Chieftain Royalty Co. v. QEP Energy Co.*, 281 F.R.D. 499, 506 (W.D. Okla. 2012) where it was found that "the minimal impact of lease language issue was conceded by Defendant at oral argument that if there are any leases in a unit that have the implied duty to market, all royalty owners in that unit should be part of the certified class, because all royalty owners share in the pool of payments. In essence, shorting the pot shorts everyone who shares the proceeds of the royalty pot." The class of which Plaintiff seeks certification consists of over 30,000 members having 34,000 leases. However, Linn Operating, Inc. has admitted that it cannot link any of the leases in its possession to 189 wells.

The basis of this action is the underpayment of royalties arising from Defendant's failure to properly report, account for, and distribute royalty interest payments from January 2002 to the present. Plaintiffs allege that Defendants have breached their lease contracts with the class member lessors, breached their fiduciary duties owed to them pursuant to unitization orders of the Oklahoma Corporation Commission, and were unjustly enriched by the underpayments of royalty. *See* Second Amended Complaint. Plaintiffs also seek an accounting regarding any and all matters necessary to determine whether Plaintiffs and class members have received their rightful share of the monies derived from production from the class wells. *Id.*

Under Oklahoma law, the implied duty to market is imputed into each and every oil lease, unless otherwise provided by the express terms of the lease. *Naylor Farms Inc. v. Anadarko OGC Co.*, 2011 WL 753782 at *3 (W.D. Okla. May 9, 2011). Pursuant to

the implied duty to market, producers are responsible for marketing a well's natural gas production. *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203, 1206 (Okla. 1998). The implied duty to market also requires the lessee to bear the full cost of any operations or processes necessary to transform the unprocessed gas into a marketable product. *Mittlestaedt*, 954 P.2d at 1205; *Wood v. TXO Production Corp..* 854 P.2d 880, 881-82 (Okla. 1992).

Producers, like the Defendants herein, often enter into contracts with midstream companies which process the gas under either percentage of proceeds ("POP"), fee or keep-whole contracts. Typically, these contracts allow the midstream companies to acquire title or possession of the unprocessed and therefore unmarketable gas at the wellhead or somewhere upstream of the midstream company's processing facilities and producers then declare that a "wellhead sale" has occurred and contend that the raw gas is "marketable" at the wellhead. This is an attempt to seemingly comply with the implied duty to market. However, the midstream companies provide the services of gathering, compressing, dehydrating, treatment and processing ("GCDTP") the gas and then remitting to the producer either a percentage of what the midstream company receives from the purchaser (POP) or the amount received from the pipeline minus a fee in kind or in cash charged for performing the GCDTP services. Producers then calculate and pay royalties based on the net amounts received from the midstream companies rather than the gross amount the midstream companies receive from the pipeline sales. By calculating the royalty payments on such net amounts, the royalty owners bear the costs of transforming the raw gas into a marketable product.

4

In this case, Plaintiffs seek certification of the following class and subclasses:

> All royalty owners who own or owned mineral interests in wells operated by Defendant Linn Operating, Inc., in the State of Oklahoma that produced natural gas and/or natural gas constituents or components, such as residue gas, natural gas liquids (or heavier liquefiable hydrocarbons), gas condensate or distillate, or casinghead gas; and/or

> All royalty owners who owned mineral interests in wells operated by Defendants Dominion Exploration Midcontinent, Inc., or Dominion Oklahoma Texas Exploration & Production Inc. and/or any Dominion-owned affiliates (collectively, "Dominion"), in the State of Oklahoma that produced natural gas and/or natural gas constituents or components, such as residue gas, natural gas liquids (or heavier liquefiable hydrocarbons), gas condensate or distillate, or casinghead gas and that were the subject of the Amended and Restated Mid-Continent Onshore Package Purchase Agreement, dated as of August 30, 2007; who are further divided into the following subclasses:

> *Subclass 1*: All class members who have or had a direct lessor-lessee relationship with Linn or Dominion;

> *Subclass 2*: All class members who do not or did not have a direct lessor-lessee relationship with Linn or Dominion;

> *Exclusions*. The following are expressly excluded from the class definition set forth above: (a) All agencies, departments or instrumentalities of the United States of America or the State of Oklahoma; (b) Defendant, its affiliates, predecessors, officers, directors and employees; (c) publicly traded oil and gas exploration companies and their affiliates and (d) privately-held oil and gas exploration companies and their affiliates; (e) persons or entities whom plaintiff's counsel is, or may be prohibited from representing under Rule 1.7 of the Oklahoma rules of Professional Conduct; (f) wells where all of the leases state royalty is to be paid on "value of raw gas at the mouth of well"; (g) wells where all of the leases state royalty is "if sold in its natural state on the leased premises where produced, ____ of the proceeds received by lessee from the sale" and the gas is sold on the leased premises; (h)

wells where all of the leases allow deductions from royalty, such as or similar to the following language:

> "[less] or [after the deduction of] a proportionate part of the production, severance and other excise and the cost incurred by lessee in delivering, processing, compressing, or otherwise making such gas or other substances merchantable"
>
> or
>
> "after deducting from such royalty lessor's proportionate amount of all post-production costs, which shall include, but shall not be limited to gross production and severance taxes, gathering and transportation costs from the wellhead to the point of sale, treating, compression, and processing, line loss/fuel, separating and dehydration. On product sold at the well, the royalty shall be _____ of the net proceeds realized from such sale, after deducting from such royalty lessor's proportionate amount of all of the above post-production costs and expenses, if any"
>
> or
>
> "a royalty of ___ part of the net proceeds realized by lessee from the sale thereof, less a proportionate part of the production, severance and other excise taxes and the cost incurred by lessee in delivering, processing, compressing, transporting, or otherwise making such gas or other substances merchantable, said payment to be made monthly";

(i) wells where the gas is sold at or near the wellhead and directly transferred into an interstate pipeline; (j) wells whose gas does not undergo any gathering, compression, dehydration, treatment or processing before entering an interstate pipeline; (k) wells that are not subject to an Oklahoma Corporation Commission

> pooling or unitization order or private pooling or unitization agreements.

To obtain certification of this action as a class action under Federal Rule of Civil Procedure 23, Plaintiffs must first establish that the four requirements of F.R.Civ.P. 23(a), numerosity, commonality, typicality and adequacy of representation, are clearly met, "under a strict burden of proof." *See* F.R.Civ.P. 23(a); *Trivizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)(quoting *Reed v. Bowen*, 849 F.2d 1307, 1308 (10th Cir. 1988)). If all four of those requirements are met, the Court must determine whether Plaintiffs have satisfied one of the conditions of Rule 23(b) that they claim is applicable. *See* F.R.Civ.P. 23(b); *Valario v. Vandeley*, 554 F.3d 1259, 1267 (10th Cir. 2009), citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, ___ L.Ed.2d ___ (2011). It may be necessary to probe behind the pleadings to make the class certification determination. *Id.*, citing *General Telephone Co. v. Southwest v. Falson*, 457 U.S. 147, 161, 102 S.Ct. 2354, 72 L.Ed.2d 740 (1982). A "rigorous analysis" is required which may entail some overlap with the merits of the plaintiff's underlying claim. *Id.* However, the Court possesses "significant latitude in deciding whether or not to certify a class." *Valario v. Vendehey*, 554 F.3d at 1264, citing *Shook v. Board of County Commissioners*, 543 F.3d 597, 603 (10th Cir. 2008).

## Numerosity

Defendants do not challenge Plaintiff's argument that this requirement of F.R.Civ.P. 23(a) is met. Thus, Defendants effectively concede that it is. And indeed a class of approximately 30,000 member is "so numerous that joinder of all members is impracticable," and this is particularly true where, as here, the members of the class live throughout the United States.

## Commonality

To establish the commonality prerequisite for class certification, Plaintiffs must show that "there are questions of law or fact common to the class." F.R.Civ.P. 23(a)(2). To meet this requirement, members of the putative class "must possess the same interest and suffer the same injury." *Trevizo v. Adams*, 455 F.3d at 1163, quoting *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A common question "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S.Ct. at 2251. *See Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed. Appx. 938, 942 (10th Cir. July 9, 2013)(quoting *Wal-Mart*). "What matters to class certification . . . is not the raising of common questions – even in droves – but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.*

In this case, Plaintiffs claim that the following are questions of law or fact common to the class; prefacing the listing by claiming that Defendants treat all royalty owners the same, using a uniform method of paying all of them:

a. When is gas in a marketable condition;

b. Whether the raw gas at the wellhead is in a marketable condition;

c. Whether Linn has deducted costs incurred to put the gas in a marketable condition and whether those deductions are improper because of the lessee's duty to market;

d. Whether Linn calculated royalty payments on less than the actual sales price of gas and whether it has the right to do so;

e. Whether deductions taken, directly or indirectly by Linn and charged to Royalty Owners in the proposed class result in an underpayment of royalty;

f. Whether Linn has the right to use percentages of gas, NGLs and condensate to pay third-party service providers without paying royalty on the amounts thereof used;

g. Whether all of the Class Wells are subject to an Oklahoma Corporation Commission pooling or unitization order;

h. Whether Linn owes fiduciary duties to the class members and whether it breached those duties by the manner in which it calculated and paid the royalty owner putative class members;

i. Whether Linn violated the Production Revenue Standards Act, Okla. Stat. tit. 52, § 570.12 in the manner in which it reported deductions on its check stubs to Royalty Owners;

j. Whether Linn properly reported all necessary and required information on Royalty Owners' check stubs from sales of gas produced from the class wells;

k. Whether Linn's duty to market is owed to all putative class members regardless of the terms of their leases and whether Linn breached that duty;

l. Whether Linn was unjustly enriched as a result of the manner in which it calculated and paid royalty and/or through the use of its affiliates to market or gather the gas and perform other services;

m. Whether Linn breached its obligations under the various leases by incorrectly calculating royalties;

n. Whether the structure of the transactions between Linn and non-affiliate non-parties resulted in an underpayment of royalty to all the Royalty Owners;

o. Whether each Class Lease contains the implied covenant of good faith and fair dealing;

p. Whether Linn breached its implied duty of good faith and fair dealing;

q. Whether Linn as operator, breached its duties (i.e. fiduciary or quasi-fiduciary) to Royalty Owners;

r. Whether all Class Leases contain the IDM;

s. Whether Linn breached its implied duty to market;

t. Whether gathering is chargeable to the Class Members' royalty;

u. Whether the raw gas from each Class Well undergoes one or more of the GCDTP services;

v. Whether the raw gas from the Class Wells is not a marketable product until it is in a condition and location acceptable to an interstate pipeline; and

w. Whether Linn calculates and pays royalty to the Class Members using a uniform methodology

Many of the proposed common questions cannot be answered for all class members in a single stroke, but require individualized inquiries by class member, well and month. Still others of the proposed common questions will not generate answers apt to drive resolution of this case. Questions which cannot be answered in one stroke for all class members are those set forth in b, c, e, f, h, j, the second portion of k, l, m, n, p, q, s, t and u. The evidence is that Defendant Linn uses more than 2,500 division order pay decks to dictate whether class members are exempt or non-exempt from deductions for the various GCDTP services on a month by month basis to determine how royalty owners are paid and that Linn does not calculate and pay royalty to class members using a uniform methodology. Moreover, whether royalty owners receive deductions for various GCDTP services is also impacted by how Linn's revenue accounting department codes those services. Those facts above render the above-listed questions as questions that cannot be answered on a class-wide basis. Proposed common questions that are not apt to drive the resolution for this case are b, i, j, o and p. However, proposed common

questions a and v are common questions of law that can be answered in one stroke for all class members, albeit that those questions of law have already been answered because this Court has already held that unless specifically negated as set forth in *Wood v. TXO Production Corp.*, 854 P.2d 880, 883 (Okla. 1992), all leases contain the implied duty to market and that generally, gas is not marketable until it is in a condition and location acceptable to an interstate pipeline. Proposed question w is a question of fact which the evidence before the Court has already answered. Thus, the Court concludes that there are at least two common questions of law that will generate common answers for the entire class and which are apt to drive resolution of this litigation.

### Typicality

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 131 S.Ct. at 2552 n. 5. The typicality requirement limits the class claims to those "fairly encompassed" by the claims of the named plaintiffs. *General Telephone Co. of the Northwest v. E.E.O.C.,* 446 US. 318, 330 (1980). Claims may be typical without being identical such that "typicality may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is disparity in the damages claimed by the representative parties and the other members of the class." *In Re Four Season Securities Laws Litigation*, 59 F.R.D. 667, 681 (W.D. Okla. 1973), *rev'd on other grounds*, 502 F.2d 834 (10th Cir. 1974)(citation omitted). But the requirement of typicality is intended to ensure that the class representatives will, by establishing their own claims, establish the bulk of the elements of each class member's claims. *See Brooks v. S. Bell Tel. & Tel. Co.*, 133 F.RDr. 54, 58 (S.D. Fla. 1990), citing *Gen. Tel. Co.*

of Sw. v. Falcon, 457 U.S. 147 (1982). The Tenth Circuit has instructed district courts to consider whether variances in lease language and gas marketability have effect on typicality. *Wallace B. Roderick Revocable Living Trust v. OXT Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013).

The McKnight's claims are governed by a single lease pertaining to gas produced from a single well, the Millington 4011 well. Their lease provides royalties are to be based on either "proceeds" if gas is sold at the well, or "market value at the well" if gas is sold off the lease. Throughout the class period, the gas has been sold off the lease. The Court has already determined that lease language provided for payment of royalties of the "market value at the well" does not negate the implied duty to market. *See Hill v. Kaiser Francis Oil Co.*, 2012 WL 4327665 at *2 (W.D. Okla. 2012). However, the differing methods of paying the royalty owners and in particular the payment methodology used on production from the Millington 4-11 well renders the Plaintiffs' claims not typical of the class claims. Unlike the owners of hundreds of other wells, costs associated with moving the Millington 4-11 gas downstream from the lease were recorded by Linn accountants to compression and transportation cost codes for which the McKnights were not exempt, rather than to "Gath" or "Gathpa" codes, for which the McKnights and thousands of other owners in hundreds of other wells were set up as "exempt" from deductions.

## Adequacy

Rule 23(a) requires that the named plaintiffs and their counsel will adequately represent the class. Legal adequacy is determined by the resolution of two questions: 1) do the named plaintiffs and their counsel have any conflicts of interest with other class

members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class. *Rutter &. Wilbanks Corp v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002), *cert. denied sub nom. Brelsford v. Rutter & Wilbanks Corp.*, 539 U.S. 915 (2003)(quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (10th Cir. 1998). Although the McKnights fall into one of the proposed subclasses of class members, those having a direct lessor-lessee relationship with Linn or Dominion, there is no true conflict between that class and those who do not have a direct lessor-lessee relationship with Linn or Dominion. Although the Plaintiffs have offered their affidavits generally attesting what their mineral interests are which has a producing gas well named the Millington 4-11 and that they have to their knowledge no conflicts of interest with the proposed class and attach some of the check stubs they have received, *see* Exhibits "8" and "9" to Plaintiffs' motion, the Court has serious questions concerning whether the Plaintiffs can vigorously prosecute this action. In deposition testimony given a year after this suit was filed, the Plaintiffs testified that they had never seen or read their lease or check stubs and had no knowledge of the lease's terms, including how it required royalties to be calculated and whether deductions were permitted. *See* Exhibit "28" to Defendants' brief at pp. 14-18, 39-44, 51-54. Exhibit "29" to Defendants' Brief at 14, 41, 46, 54-58, 60, 62.

The adequacy requirement mandates an inquiry into the willingness and ability of the class representatives to "take an active role in and control the litigation and to protect the interests of absentees." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001)(*quoting Horton v. Goose Creek Independent School District*, 690 F.2d 470,

484 (5th Cir. 1982). Class representatives must possess a sufficient level of knowledge and understanding to be capable of "controlling" or "prosecuting" the litigation. *Id. See also Tucker v. BP America Production Co.*, 278 F.R.D. 646, 655 (W.D. Okla. 2011)(because the class representative lacked a fundamental knowledge of the facts of the case, the court found he was an inadequate class representative)).

Class counsel is clearly adequate to prosecute this case as shown by his performance at the evidentiary hearing and as demonstrated in a prior successful class action before this Court.

### **Rule 23(b)(1)**

Plaintiffs for the first time in their proposed findings of fact and conclusions of law suggest that this class action is appropriate under F.R.Civ.P. 23(b)(1)(A) or (B). Rule 23(b)(1) provides that a class action that meets the requirements of Rule 23(a) may be maintained as a class action if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> F.R.Civ.P. 23(b)(1)(A) & (B).

"The most important element of Rule 23(b)(1)(A) is the question of what constitutes "incompatible standards of conduct" warranting certification. *Newberg on Class Actions* § 4:7 (7th Ed. 2012). "The critical answer is that courts generally will <u>not</u> certify a class under Rule 23(b)(1)(A) simply because separate damages actions may reach different results - inconsistent verdicts on liability and damages do not alone give rise to incompatible standards of conduct." *Id.* (footnote omitted). If the mere threat of inconsistent jury verdicts enabled certification under 23(b)(1)(A), every case involving multiple plaintiffs could fall into this category. Rule 23(b)(3) is specifically designed to cover class actions seeking damages and Rule 23 establishes unique notice and opt-out rights to protect absent class members in damage actions. *Id.* If all of these actions were equally maintainable under Rule 23(b)(1)(A), litigants could readily circumvent Rule 23(b)(3) and its attendant procedural protections. *Id.* For these reasons, some courts have concluded that money damage actions are not available in Rule 23(b)(1)(A) cases. *Newberg*, at 4:7. Applying these principles, this case is not maintainable as a class action under Rule 23(b)(1)(A).

Rule 23(b)(1)(B) provides for what is commonly known as limited fund class actions. *See Newberg*, at 4:16. Where there are limited funds sought by multiple claimants, those claimants who earlier pursue their claims may leave latter claimants without a remedy, hence substantially impair or impede the latter claimant's ability to protect their interests. This form of class has no application to the facts before the Court.

## Rule 23(b)(3)

Plaintiffs also assert that their action is maintainable as a class action under Rule 23(b)(3), F.R.Civ.P. A class action under that provision requires the court to find that common question of law or fact predominate over any questions affecting only individual class members and that a class action is superior to other available methods for adjudicating the controversy. F.R.Civ.P. 23. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action
>
> F.R.Civ.P. 23(b)(3).

Because many of the royalty owners have small interests, the class members do not have interests of individually pursuing or prosecuting separate actions or the incentive to do so. Of 1,171 wells acquired from Dominion, 844 of the class wells were the subject of an earlier class action, similar to this case. *Kouns v. Louis Dreyfus Natural Gas*, CJ-98-20. Certainly it is desirable to concentrate this litigation involving over 34,000 royalty owners, over 36,515 leases and 1,693 wells in one forum. At the same time, doing so poses substantial manageability difficulties, not the least of which is determining who the class members are. But the Court finds that adjudicating this case as

a class action is superior to other methods for fairly and efficiently adjudicating the controversy.

However, the Court finds that common questions of law and fact do not predominate over questions affectincg only individual members. This is so because of Defendant Linn's complex method of calculating and paying the individual royalties. Linn does not pay all royalty owners across the board in the same manner. A determination of how much Linn paid each royalty owner and a second inquiry as to how much it should have paid each owner will require owner by owner and month by month calculations with examination of whether Linn's pay decks listed owners as exempt from some or all deductions for post-production services and an examination of how Linn's revenue accounts "booked" certain deductions. These individualized inquiries will be necessary to determine whether Defendant Linn breached its contract with each of the putative class members, not just to determine damages. Moreover to determine whether Linn accurately reflected permissible deductions on the owners' pay stubs (beyond the question of whether Linn only reported net amounts rather than gross amounts), will require examination of every pay stub.

## Identifiable Class

Finally, the Court agrees with Defendant that class membership is not objectively ascertainable. To determine whether the exclusions from the class set out in Plaintiffs' class definition apply will require a well by well and month by month examination of lease language and payment methodology, since for example only member wells in which all the leases exempt the owners from deduction are excluded from the class. The

Court would be required to hold evidentiary hearings to determine which potential class members qualified for inclusion and exclusion from the class. "If class members are impossible to identify without extensive and individualized fact-finding or "mini-trials," then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 593 (3rd. Cir. 2012). That is the case here.

## **Conclusion**

In accordance with the foregoing, Plaintiffs' motion for class certification must be DENIED.

IT IS SO ORDERED this 25th day of February, 2016.

*[signature]*

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE